UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**26-60140-CR-DAMIAN/STRAUSS**

Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1343
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

vs.

JAYNIER MOYA,
LUIS MONTANO, and
YUNIARKA GARCIA,

Defendants.

_____/

FILED BY_____*KAN*_____D.C.

*May 21, 2026*

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At times relevant to this Indictment:

### Background on Clinical Trials

1.     Clinical investigations, also known as clinical trials or clinical studies, were research studies conducted on voluntary human subjects designed to answer specific questions about the safety and effectiveness of new drugs. Clinical trial "sponsors," often pharmaceutical companies, initiated clinical trials.

2.     The United States Food and Drug Administration ("FDA") was responsible for ensuring that drugs intended for human use were safe and effective. The FDA relied on the truthfulness and accuracy of the results of clinical trials to make decisions about the approval of new drugs with the goal of ensuring that all FDA-approved drugs were safe and effective for their approved uses in humans.

3.      Before beginning a clinical trial, sponsors were required to provide the FDA with extensive information regarding the proposed trial, including a detailed investigation plan known as a "trial protocol" or "study protocol." The trial protocol described, among other things, the eligibility criteria for individuals to enroll as trial subjects, schedules of tests and procedures, drug and dosage regimens, the length of the trial, and the health outcomes to be measured by the trial. Clinical trials were required to be conducted according to the trial protocol, as well as applicable laws and FDA regulations.

4.      Sponsors sometimes retained contract research organizations ("CROs") to assume, as an independent contractor with the sponsor, one or more of the obligations of a sponsor, including the design of a trial protocol, the selection or monitoring of clinical trials, the evaluation of reports, and the preparation of materials to be submitted to FDA.

5.      Sponsors and CROs typically contracted with multiple clinical trial sites to perform clinical trials. Under such an arrangement, each individual clinical trial site was responsible for identifying trial subjects, enrolling them into the trial, performing the trial, gathering data, and reporting the data to the sponsor or CRO, in accordance with the trial protocol.

6.      Each clinical trial site had a clinical investigator, also known as a principal investigator. The clinical investigator was the individual responsible for conducting the clinical investigation at that site and ensuring that the clinical trial was conducted according to the trial protocol. Responsibilities of the clinical investigator included personally supervising the trial, including all requirements regarding the qualification of the subjects, obtaining informed consent from subjects, dispensing study medication, collecting and reporting data, reporting adverse events, and ensuring that all employees working on the trial met the same obligations.

2

7. The clinical investigator was also required, by regulation, to prepare and maintain records relating to clinical trials. These records, known as "case histories," included records of the dispensation of the trial drug, including dates and quantities of drugs dispensed to subjects, informed consent forms and medical records for each subject participating in the clinical trial, and records of all observations and other data pertinent to the investigation for each subject administered an experimental drug or placebo.

8. The clinical investigator had the authority to delegate certain responsibilities to clinical trial site staff working on the clinical trial, including to clinical research coordinators.

9. The FDA had the authority to inspect a clinical investigator's site to ensure that the clinical investigator was complying with all applicable laws and regulations in conducting clinical trials. The FDA's inspection authority included the authority to review case histories and other records maintained by the clinical investigator.

10. A clinical investigator provided information to the sponsor or CRO about each trial subject enrolled in the trial, including the subject's medical history, laboratory results, and reaction to the drug under investigation. The sponsor then provided the information to the FDA for its use in evaluating whether the drug was safe and effective and should be approved for its intended use.

**The Defendants and Related Persons and Entities**

11. Pines Care Research Center, LLC ("Pines Care") was a Florida company, located in Broward County, Florida, that purported to conduct clinical trials for pharmaceutical companies and other sponsors, including Sponsor A.

12. Sponsor A was a pharmaceutical development company based in Guernsey, a British Crown Dependency in the English Channel, that sponsored two separate but closely related asthma clinical trials.

13. CRO A was a company based in Morrisville, North Carolina that Sponsor A hired to serve as its CRO and to monitor the asthma clinical trials.

14. Defendant **JAYNIER MOYA** was a resident of Broward County, Florida and a co-owner of Pines Care, who served as principal investigator for the purported clinical trials conducted at Pines Care from in or around May 2014 and continuing through in or around January 2022.

15. Defendant **LUIS MONTANO** was a resident of Miami-Dade County, Florida and a clinical research coordinator at Pines Care from in or around February 2018 and continuing through in or around January 2022.

16. Defendant **YUNIARKA GARCIA** was a resident of Broward County, Florida and a clinical research coordinator at Pines Care from in or around August 2017 and continuing through in or around January 2022.

17. Co-Conspirator 1 was a resident of Miami-Dade County, Florida and was a clinical research coordinator at Pines Care from in or around February 2016 and continuing through in or around December 2020.

18. Co-Conspirator 2 was a resident of Miami-Dade County, Florida and received payments to help falsify clinical trial data at Pines Care.

19. Co-Conspirator 3 was a resident of Miami-Dade County, Florida and received payments to help falsify clinical trial data at Pines Care.

20. Co-Conspirator 4 was a resident of Miami-Dade County, Florida and a clinical research coordinator at Pines Care from in or around December 2016 and continuing through in or around September 2020.

4

**The Asthma Trials**

21. Beginning in or around February 2019 and continuing through in or around January 2022, Pines Care purported to conduct various clinical trials on behalf of sponsors and CROs, including Sponsor A and CRO A.

22. In or around February and March 2019, Pines Care signed Clinical Trial Agreements with CRO A, acting on Sponsor A's behalf, in which Pines Care agreed to serve as a trial site for two clinical trials concerning investigational drugs intended to treat persons suffering from asthma (hereinafter, the "asthma trials").

23. The first asthma trial (hereinafter "Asthma Trial 1") was designed to compare the efficacy and safety of two investigational medications when administered in response to a "severe asthma exacerbation," commonly referred to as an "asthma attack," in subjects with moderate to severe asthma.

24. The second asthma trial (hereinafter "Asthma Trial 2") was designed to assess the efficacy and safety of an investigational medication and its components on the improvement of lung function and asthma symptoms in subjects with mild to moderate asthma.

25. The Clinical Trial Agreements between Pines Care and CRO A included a schedule of payments that Sponsor A would pay Pines Care per trial subject for each measurement and procedure required under the trial protocol for the asthma trials. For each subject who completed all the required visits in Asthma Trial 1, the Clinical Trial Agreement required Sponsor A to pay Pines Care approximately $13,381.55. For each subject who completed all the required visits in Asthma Trial 2, the Clinical Trial Agreement required Sponsor A to pay Pines Care approximately $11,417.90. The Clinical Trial Agreements also included payments that Sponsor A would pay Pines Care for subjects who failed to meet the screening visit criteria and were ineligible to participate in the asthma trials.

26. The trial protocols for the asthma trials required all subjects enrolled in the trial to meet specific eligibility criteria. The trial protocol for Asthma Trial 1 required each subject to have received an asthma diagnosis at least one year prior to the subject's first visit to Pines Care and have a documented history of at least one severe asthma exacerbation within one year before the first visit to Pines Care.

27. The Asthma Trial 1 trial protocol required each subject to complete at least seven visits to Pines Care: an initial screening visit to assess eligibility, referred to as "Visit 1," and, if enrolled in the trial, six subsequent visits ("Visit 2" through "Visit 7").

28. At Visit 1, the trial protocol required the clinical investigator to perform a physical examination of the subject. The clinical investigator could delegate the physical examination to a sub-investigator.

29. To assess the efficacy of the investigational drug, the trial protocol required subjects to perform pulmonary function tests ("PFTs") at Visits 1, 2, 5, and 6. The PFTs were performed using a spirometer device, which measured the volume and speed of air inspired and expired by the subject's lungs.

30. The spirometer electronically transmitted the data collected from each PFT to a vendor (the "spirometry vendor") hired by Sponsor A.

31. The Asthma Trial 2 trial protocol required each subject to have received a documented asthma diagnosis in the six months prior to the subject's first visit to Pines Care.

32. The Asthma Trial 2 trial protocol required each subject to complete at least six visits to Pines Care: an initial screening visit to assess eligibility, referred to as "Visit 1," and, if enrolled in the trial, five subsequent visits ("Visit 2" through "Visit 6").

33. At Visit 1 and Visit 6, the Asthma Trial 2 trial protocol required the clinical investigator to perform a physical examination of the subject. The clinical investigator could delegate the physical examination to a sub-investigator.

34. At Visit 1, the Asthma Trial 2 trial protocol required the subject to perform two PFTs. At Visit 2, Visit 3, Visit 4, Visit 5, and Visit 6, the trial protocol required the subject to perform 12 PFTs. At each of these visits, the 12 PFTs had to be spaced out at specified intervals over a period of seven hours. The spirometer electronically transmitted the data collected from each PFT to the spirometry vendor.

35. Beginning in or around February 2019 and continuing through in or around July 2021, Pines Care purported to conduct the asthma clinical trials pursuant to the Clinical Trial Agreements and the trial protocols. Pines Care and **JAYNIER MOYA** falsely reported to Sponsor A and CRO A that Pines Care screened approximately 14 individuals for Asthma Trial 1, enrolling approximately 11 of those individuals as trial subjects, and screened approximately 69 individuals for Asthma Trial 2, enrolling approximately 59 of those individuals as trial subjects. Based on these representations, the sponsor paid Pines Care approximately $824,223.71.

**COUNT 1**
**Conspiracy to Commit Wire Fraud**
(18 U.S.C. § 1349)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. Beginning in or around February 2019, and continuing through in or around January 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**JAYNIER MOYA,**
**LUIS MONTANO,** and
**YUNIARKA GARCIA,**

did willfully, that is, with the intent to further the object of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other, and with Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-Conspirator 4, and others known and unknown to the Grand Jury, to commit wire fraud, that is: to knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

3.     It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things, (a) securing and entering into contracts for Pines Care to conduct the asthma trials, (b) creating false and fraudulent records of trial subjects using the means of identification and identification documents of individuals who did not participate in the asthma trials, (c) submitting and causing the submission, via wire interstate communication, of false and fraudulent information associated with the purported trial subjects to the clinical trial database system, (d) causing Sponsor A and CRO A to make payments to Pines Care under those contracts by making material false and fraudulent representations, (e) concealing and causing the concealment of false and fraudulent representations, and (f) diverting proceeds of the fraud for their personal use and benefit and to further the conspiracy.

### Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

8

4. **JAYNIER MOYA** and Pines Care entered into Clinical Trial Agreements with Sponsor A and CRO A, in which **MOYA** and Pines Care agreed to conduct the asthma trials. As part of those agreements, **MOYA** and Pines Care agreed to conduct the asthma trials according to and in compliance with the trial protocols and all applicable laws and regulations.

5. To induce Sponsor A and CRO A to enter into Clinical Trial Agreements with and provide money to the defendants and their co-conspirators, the defendants and their co-conspirators made and caused others to make numerous materially false and fraudulent statements to Sponsor A, CRO A, and the FDA, including, among other things, the following:

    a.    That **JAYNIER MOYA**, Pines Care, and individuals employed by Pines Care conducted the asthma trials in accordance with the trial protocols and FDA regulations;

    b.    That all subjects participated in the screening process and informed consent process;

    c.    That enrolled subjects satisfied the inclusion and exclusion criteria for the asthma trials and participated in accordance with the trial protocols;

    d.    That **JAYNIER MOYA** conducted physical examinations of the subjects;

    e.    That each subject provided blood samples and submitted to PFTs in the asthma trials;

    f.    That all subjects received the study medications and completed office visits in accordance with the trial protocols; and

    g.    That all subjects were paid the correct stipend for their participation in the clinical trials.

6.      **JAYNIER MOYA**, **LUIS MONTANO**, **YUNIARKA GARCIA**, Co-Conspirator 1, and Co-Conspirator 4 created false and fraudulent records of trial subjects using the means of identification and identification documents of individuals who did not participate in the asthma trials, and submitted the information associated with the purported trial subjects to the clinical trial database systems in order to induce Sponsor A and CRO A to make payments to Pines Care to which Pines Care was not entitled.

7.      In order to prevent Sponsor A, CRO A, and the FDA from learning that **JAYNIER MOYA**, **LUIS MONTANO**, **YUNIARKA GARCIA**, Co-Conspirator 1, and Co-Conspirator 4 had created false and fraudulent data for the asthma trials and submitted false and fraudulent data to the clinical trial database systems, **MOYA**, **MONTANO**, **GARCIA**, Co-Conspirator 1, and Co-Conspirator 4 created false and fraudulent case histories to make it appear that the purported subjects had, among other things, satisfied the eligibility criteria to participate in the asthma trials, signed informed consent forms to participate in the asthma trials, received a physical examination, provided laboratory samples, received and had taken the study medication, completed questionnaires, and received payment for visits to Pines Care as part of the asthma trials.

8.      **JAYNIER MOYA**, **LUIS MONTANO**, **YUNIARKA GARCIA**, Co-Conspirator 1, and Co-Conspirator 4 obtained and used false and fraudulent medical records for multiple individuals so that **MOYA** could enroll those individuals as subjects in the asthma trials, despite the individuals not having the legitimate documented diagnosis needed to qualify for and participate in the asthma trials.

9.      **JAYNIER MOYA** created and signed paperwork falsely and fraudulently claiming he had performed physical examinations of subjects he did not see in person or who never participated in the asthma trials.

10

10.    **YUNIARKA GARCIA** created and signed paperwork falsely and fraudulently claiming she had obtained laboratory samples for certain subjects she did not in fact see and who never participated in the asthma trials.

11.    **JAYNIER MOYA, LUIS MONTANO**, Co-Conspirator 1, and Co-Conspirator 4 paid Co-Conspirator 2 to perform PFTs instead of the enrolled asthma trial subjects, even though Co-Conspirator 2 was not enrolled in either asthma trial, to conceal the fact that the purported subjects for whom Co-Conspirator 2 performed the PFTs were not legitimately participating in either asthma trial.

12.    **JAYNIER MOYA, LUIS MONTANO**, and Co-Conspirator 1 paid Co-Conspirator 3 to perform PFTs for the subjects, even though Co-Conspirator 3 was not enrolled in either asthma trial, to conceal the fact that the purported subjects for whom Co-Conspirator 3 performed the PFTs were not legitimately participating in either asthma trial.

13.    **LUIS MONTANO**, Co-Conspirator 1, and Co-Conspirator 4 operated the spirometer and instructed Co-Conspirator 2 to perform the PFTs for certain purported subjects who were not participating in the asthma trials.

14.    **LUIS MONTANO** operated the spirometer and instructed Co-Conspirator 3 to perform the PFTs for certain purported subjects who were not participating in the asthma trials.

15.    As a result of the false and fraudulent representations made by **JAYNIER MOYA, LUIS MONTANO, YUNIARKA GARCIA**, Co-Conspirator 1, and Co-Conspirator 4, Sponsor A paid Pines Care to conduct the asthma trials. **MOYA, MONTANO, GARCIA**, Co-Conspirator 1, and Co-Conspirator 4 used the fraud proceeds to benefit themselves and others, and to further the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-4
### Wire Fraud
(18 U.S.C. § 1343)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around February 2019, through in or around January 2022, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**JAYNIER MOYA,**
**LUIS MONTANO**, and
**YUNIARKA GARCIA,**

did knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, certain writings, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice to defraud for the defendants and their accomplices to unlawfully enrich themselves by, among other things, (a) securing and entering into contracts for Pines Care to conduct the asthma trials, (b) creating false and fraudulent records of trial subjects using the means of identification and identification documents of individuals who did not participate in the asthma trials, (c) submitting and causing the submission, via wire interstate communication, of false and fraudulent information associated with the purported trial subjects to the clinical trial database systems, (d) causing Sponsor A and CRO A to make payments to Pines Care under those contracts by making material false and fraudulent representations, (e)

12

concealing and causing the concealment of false and fraudulent representations, and (f) diverting proceeds of the fraud for their personal use and benefit and to further the conspiracy.

## The Scheme and Artifice

4.      The Manner and Means Section of Count 1 is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## Use of the Wires

5.      On or about the dates set forth as to each count below, in the Southern District of Florida and elsewhere, the defendants, **JAYNIER MOYA**, **LUIS MONTANO**, and **YUNIARKA GARCIA**, for the purpose of executing the above-described scheme and artifice to defraud, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds as described below:

| Count | Approx. Date | Description of Wire Transmission |
|-------|-------------|--------------------------------|
| 2 | June 4, 2021 | Electronic transmission of clinical trial data from the asthma trials from Pines Care in the Southern District of Florida to an agent of the sponsor in New York, NY |
| 3 | January 6, 2022 | ACH Transfer for Asthma Study 2 in the amount of $65,970.19 from CRO A in Morrisville, North Carolina to the Pines Care Research Center, LLC Bank Account at Bank of America ending in 4713 in the Southern District of Florida |
| 4 | May 16, 2022 | ACH Transfer for Asthma Study 1 in the amount of $13,767.08 from CRO A in Morrisville, North Carolina to the Pines Care Research Center, LLC Bank Account at Bank of America ending in 4713 in the Southern District of Florida |

In violation of Title 18, United States Code, Sections 1343 and 2.

13

## FORFEITURE ALLEGATIONS
(18 U.S.C. § 981(a)(1)(C))

1.      The allegations of this Indictment are hereby re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants, **JAYNIER MOYA**, **LUIS MONTANO**, and **YUNIARKA GARCIA**, have an interest.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third party;

   c.      has been placed beyond the jurisdiction of the court;

   d.      has been substantially diminished in value; or

   e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

14

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 28, United States code Section 2461(c).

A TRUE BILL

FOREPERSON

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

LORINDA LARYEA
CHIEF
U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION

By: _____
ANDREW K. CRAWFORD
BRIANNA M. GARDNER
TRIAL ATTORNEYS
U.S. DEPARTMENT OF JUSTICE
FRAUD SECTION

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

JAYNER MOYA, et al.,

_____ /
Defendants.

**CASE NO. _____**

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**

New Defendant(s) (Yes or No) _____

Number of New Defendants _____

Total Number of New Counts _____

**Court Division** (select one)

☐ Miami    ☐ Key West    ☐ FTP

☒ FTL      ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) __No__
   List language and/or dialect: _____

4. This case will take __10__ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                    (Check only one)
   I    ☐  0 to  5 days                ☐ Petty
   II   ☒  6 to 10 days                ☐ Minor
   III  ☐ 11 to 20 days                ☐ Misdemeanor
   IV   ☐ 21 to 60 days                ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No._____

7. Has a complaint been filed in this matter? (Yes or No) __No__
   If yes, Judge_____ Magistrate Case No._____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) __No__
   If yes, Judge _____ Case No._____

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) __No__

13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) __No__

14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? __No__

15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? __No__

16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? __No__

17. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026? __No__

By: _____
ANDREW CRAWFORD
DOJ Trial Attorney
SDFL Court ID No.    A5503084

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

Defendant's Name:       JAYNIER MOYA

Case No: _____

Count #:  1

Title 18, United States Code, Section 1349

Conspiracy to Commit Wire Fraud
* **Max. Term of Imprisonment:**  20 years
* **Mandatory Min. Term of Imprisonment (if applicable):**  N/A
* **Max. Supervised Release:**  3 years
* **Max. Fine:  $250,000 or twice the gross gain or loss from the offense**

Counts #:  2 – 4

Title 18, United States Code, Section 1343

Wire Fraud
* **Max. Term of Imprisonment:**  20 years as to each count
* **Mandatory Min. Term of Imprisonment (if applicable):**  N/A
* **Max. Supervised Release:**  3 years
* **Max. Fine:  $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

Defendant's Name: _____ **LUIS MONTANO** _____

Case No: _____

Count #:   1

Title 18, United States Code, Section 1349

Conspiracy to Commit Wire Fraud

* **Max. Term of Imprisonment:**   **20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

Counts #:   2 – 4

Title 18, United States Code, Section 1343

Wire Fraud

* **Max. Term of Imprisonment:   20 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:   3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.   It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

Defendant's Name: _____ **YUNIARKA GARCIA** _____

Case No: _____

Count #:   1

Title 18, United States Code, Section 1349 _____

Conspiracy to Commit Wire Fraud _____
* **Max. Term of Imprisonment:     20 years**
* **Mandatory Min. Term of Imprisonment (if applicable):   N/A**
* **Max. Supervised Release:     3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense** _____

Counts #:    2 – 4

Title 18, United States Code, Section 1343 _____

Wire Fraud _____
* **Max. Term of Imprisonment:     20 years as to each count**
* **Mandatory Min. Term of Imprisonment (if applicable):    N/A**
* **Max. Supervised Release:     3 years**
* **Max. Fine:   $250,000 or twice the gross gain or loss from the offense**

**\*Refers only to possible term of incarceration, supervised release and fines.  It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.**